Good morning. I'm Tom Slosser here on behalf of TDX and BSE, which are the abbreviations for Tanadgusix and Bering Sea Ecotech, the plaintiffs below. Since 1985, when the commercial fur seal harvest was outlawed in the Pribilof Islands, TDX has been under an urgent mission to create employment and job skills training to diversify the abilities of support for the largest Aleut community in the world. That is why, when they were recruited by GSA's agents... How far is it from St. Paul to Honolulu? Roughly 4,000 miles, Your Honor. And how do you get there from St. Paul? You go to Anchorage, one day to Anchorage, and then another day, and then overnight to Honolulu? That's not in the record. And actually, I've never done that, Your Honor, so I don't know. But I think you can make a connection and go the same day. It's hard to get out of St. Paul, though. They used to fly three days a week. How many days do they fly now? I don't know, Your Honor. I'm sorry. If you can get out of the fog. You've been to St. Paul, I suppose. Pardon? You've been to St. Paul. I have not been to St. Paul. I'm sorry, Your Honor. I have. So the idea was to train the natives in St. Paul so that they could have more job opportunities after the seal harvest. In ship repair, in welding, in the skills that they could use in Alaska. But this dry dock wasn't going to be in St. Paul. It was going to be 4,000 miles away. Absolutely, Your Honor. Whatever happened to that fraud case that was going on in Hawaii? Well, the government brings this up, and frankly, I think it's very prejudicial. This is a public record. It is a matter of... The government decided to join, right? That's correct. They did decide last fall. Nothing's been decided. The case is in discovery. Motions for partial summary judgment as to measure of damages have been filed and submitted. But nothing has been decided. So what they were doing, they were flying your people, the people of St. Paul Island, to Hawaii to work on ships in this dry dock? Yes, absolutely. Now the dry dock... How many people were flown to Hawaii other than the executives of the native corporation that were negotiating the deal? The total number of participants in the training program, I don't know, Your Honor. In the range of 25. There are personnel records in the exhibits before the district court relating to many of these individuals. But the seasonal nature of the work fit perfectly, because during certain seasons of the year at St. Paul, it's not feasible to fish. And those are the times in which it is most necessary, or most possible, to get employment in the shipyard in Oahu. When they come back, where do they go to work in Alaska? You don't have any shipbuilding or ship repair in St. Paul, do you? Or do you? Well, there is a small boat harbor, much too small a harbor for a dry dock of this size. And around the Pribilof Islands is the massive Bering Sea fishery. So there is ship supply activity at St. Paul, and some commerce relating to ships. Certainly there is ship traffic in and out, and small boats. And the Aleuts, of course, are the original mariners of this continent. So where would they go to work when they came back from Hawaii? Well, we didn't have a chance to introduce that evidence, but they would be working in St. Paul, in ship repair, and elsewhere in Alaska. There is a shipyard in Ketchikan. Whether any Aleut people are employed there, I do not know. But because of these possibilities for mariners, when TDX was approached by GSA's agent, recruited to be the donee of this dry dock, they were very interested. This turned out to be a nightmare, because the basic question here, whether the arrangement using the shipyard with the partner in Hawaii is lawful, turns on what the parties did in the documents and what the regulations provide. And the district court, in effect, conducted a paper trial and resolved disputes that should not have been resolved on summary judgment. Let me ask you. You said there was no place to put this dry dock in St. Paul. So they never would have planned to bring the dry dock to St. Paul. There was no proposal to bring the dry dock to St. Paul, and this was discussed and approved by GSA's agent in Alaska. Or to bring it anywhere else in Alaska? Well, the prior possible donee, Atena Corporation, evidently explored bringing it to Ketchikan. But the Ketchikan shipyard is a subsidiary of the state of Alaska, and it was determined that the dry dock could not be used there, and Alaska opposed bringing this dry dock to Alaska. So TDX was aware of that problem with Atena and was told specifically by GSA's agents in Alaska not to bring the dry dock here. What does the contract say, though? Well, the contract is an interesting point. The district court thought that the only contract was the vessel conditional transfer document, which I'll call the VCTD. But actually that's wrong because the regulations of GSA deal with donations of vessels, and they provide, and this is from, these are the regulations that were in effect at the time. They've been recodified. But this is 41 U.S.C. 101-44-108-9b, Donation of Vessels. For a donation in accordance with the provisions of this subpart, the following documentation shall be submitted along with the Form 123, that's the first element, the Donor's Letter of Intent, the second element, a letter signed confirming the applicant's eligibility, that's the third element, fourth, a signed state distribution document, and finally the VCTD. There is a genuine issue of material fact about some of these documents, and so the contracts are actually at least these five things. Let me start with the first one, the Form 123. The Form 123, this is at ER 40, shows that the transfer to the State Agency for Surplus Property, the SASP, occurred on March 22, 2001. Now the inference the Court should have drawn from this is that documents executed before March 22 were not intended to have present effect because the SASP had no power to transfer before March 22. What was the date of that document? March 22, 2001, Your Honor, at ER 40. Secondly, the signed distribution document, the SASP submitted the signed distribution document in support of its answer, and this is at ER 10. I'm sorry, the declaration that I'm going to get to is at ER 10. Counsel, I'm getting a little lost here, and I want to straighten out my understanding of where you are so far. When I look at the vessel conditional transfer document, it says that the transfer is for the purposes as set forth in the DONEYS letter of intent. I look at the letter of intent, and it says that rehabilitation is to take place in Hawaii, and it says that this rehabilitation is necessary before the dry dock can be safely transported any long distances. And then I look back at the conditional transfer document, and it says that the property reverts to the government if it's not used as set forth, and it says in paragraph 8 that the DONEY shall not remove the dry dock permanently for use outside the state. It's perfectly clear to me. I know you disputed this, but it seems clear to me that they're talking about the state of Alaska, not the state of Delaware or Texas or Hawaii or one of the others. And when I look at the letter of intent, it seems quite clear that they're talking about rehabilitating it so that it can be transported in Hawaii and then bringing it to Alaska. I don't see where the ambiguity is. You're missing something, Your Honor. First of all, there are five elements to the contract, and the VCTD and the incorporated letter of intent are two of them. What's the VCTD? The vessel conditional transfer document, the one you're referring to. Make it easier for me to follow what you say when you talk if you use words. Okay. I can't remember all the information. I'll try to call it transfer document. In paragraph eight of the transfer document that the court read, if the court had continued to the end of the sentence, it says, except as authorized by GSA, nor permanently removed for use outside the state without the prior written approval of GSA. A key element of this case is whether there was prior written approval of GSA. It says that when authorized language that you quoted is about whether the proceeds are for the account of the U.S. government if the dry dock is sold. So that's irrelevant. I suppose you must be talking about the phrase without the prior approval of GSA, where it says can't be removed for use permanently outside the state. You are correct, Your Honor. I'm sorry. I misspoke the first time. But it is that first sentence that is key. And so the existence or none of the prior approval. Okay. I didn't see. I looked through this. I didn't see any approval by the GSA for using it in Hawaii permanently. Let me show you where it is, Your Honor. Where it is is in the attachments to the letter of intent. Now, the letter of intent is. If somebody were in the excerpts of record, I should look for this. You should look at page ER27. ER27 is a letter from our partner in Hawaii, Morisco. Among other things, it refers to putting the dry dock into service. But the most important. That sure isn't an approval by the government. I think that's the outfit that. May I explain why it's approval by the government, Your Honor? The reason it is approval by the government is because the DONY's letter of intent had to provide a vessel utilization plan. The regulation that I cited before, 108-9, requires a detailed vessel utilization plan.  And the people in the SASP office were not lawyers. And TDX attached this letter to the letter of intent, and it said that this was the letter of reaffirmation of commitment from Morisco Limited, the shipyard owner, our partner in the state of Hawaii, where rehabilitation will take place. And it goes on in the next paragraph to say, we have a viable plan of business for this capital asset. This was the vessel utilization plan. That is why they attached it. All right. So let me ask you. So you're saying the January 18, 2001 letter is the permission by GSA? Well, when it was approved as part of the letter of intent, five things had to be approved. Well, I understand that. So let me just ask you, why did your client then write to GSA on July 20 stating in that letter, paragraph 5, our vessel conditional transfer document contains these conditions, which forbids removing it permanently for use outside the state of Alaska, and now we want you to consider a waiver if the January transaction was a waiver? The short answer is they wrote that letter because they were directed to write that letter by the SAS, the State Agency for Surplus Property, GSA's agent in Alaska. This letter was written long after the controversy arose, and it became clear as the controversy arose, and the government's excerpts include some of the letters from the competing shipyard, which filed this CRETAM action and wrote to everybody in the government casting aspersions. After the controversy arose, it became clear that some people within GSA, not GSA's agent here, but people back east, did not know what they had approved and thought that the dry dock was being moved to Alaska. That wasn't what the document said. There is an explanation of how the documents were developed. Any normal person would think that that's what was being talked about. I mean, you read this letter from TDX at ER 28. It says, St. Paul Island, our home community, is reeling from a collapse in crab stocks. And then it says what they're trying to do is development of employment opportunities for our shareholders. The dry dock will be used to enhance both business and employment opportunities for shareholders. And it says Aleut shareholders and other Alaskans will be provided the opportunity to develop skills in welding, metalwork, shipbuilding, repair, and hazmat management. And then it turns out it's going to be in Hawaii. That's where they would be trained, Your Honor. As you know, breaking into the shipyard business, a heavily unionized industry, is not easy, and finding a partner who would train Aleut people was not easy. That was the place they would do the training, and this is described in the Declaration of Mr. Kennedy, one of the most important pieces of evidence the court disregarded in granting summary judgment against Tanagusics. Where does it say, maybe that's what you're going to show me, where does it say even though this is because of the collapse of crab stocks in St. Paul, and even though the idea is to train Aleuts from St. Paul who are reeling from this problem of economic opportunity, the place where we're going to do all this is Hawaii, and we're going to keep the thing in Hawaii? In the declaration I just referred to, Your Honor. Okay, what page? ER 223, I'm sorry, 233 and 232. 232 paragraph 9 talks about the state of Alaska was very interested in our plan because we'd operate the dry dock in Hawaii rather than Alaska. Hawaii became more attractive as I learned of the exorbitant costs and so on associated with moving it. Paragraph 11, I discussed with Mr. Jobcar and Mr. Growning, operating the excompetent in Hawaii with an experienced shipyard. On the next page he talks about Aleut crews being used to position the vessels for lifting. So this was fully discussed with GSA's agent. The inferences that should have been drawn from these documents are that TDX and GSA's agent believed that operation in Hawaii was approved. The alternate ground, that TDX violated a full control obligation, similarly turns on disputed facts. The district court ignored the fact that an agreement was made before the dry dock went into operation, which gave TDX complete control. However, they did come up with a declaration from Ms. Jobar that said day-to-day management was by the shipyard, so there probably is a genuine issue of material fact there. If I may, I would reserve the rest of my time. Thank you, Counsel. May it please the Court, my name is Thomas Bondi. I represent the federal appellees. Your Honors, as we stated in our brief, this case presents the question of whether surplus federal property donated through the State of Alaska to an Alaskan native village corporation for its use in local Alaskan economic development may instead be used by a third party in Hawaii as part of its regular for-profit business operations. The answer to that question is no. That's what the district court said, and the district court should be affirmed as a matter of law. This case turns, Your Honors, on two separate but interrelated purely legal questions. The first one is whether under the donation program at issue, where a donation as here is made through the State of Alaska to a donee in Alaska for Alaskan economic development, it is permissible for the property nevertheless to be used permanently outside of the State of Alaska. And the answer to that is no. In the statute, the regulations, and the transfer. It's no without prior written approval. That's right. And what is your response to the appellant's argument that there was prior approval? I think they referred to Excerpts 232 and 233. Well, of course there wasn't, Your Honor. First of all, Excerpts 232 and 233 is a declaration submitted in litigation. It's not some kind of GSA document that says we approve. And the only relevant thing, Your Honor, on page 233 of the document that you're referring to is that by its terms, the declarant there is contemplating that he knew before this transfer was made that ultimately for this property to be used in Hawaii, some kind of waiver of normal program requirements would be needed from the federal government. And there are other documents in the record that show that, too. TDX knew before it signed these transfer documents that if it wanted to use this property in this way in Hawaii, it would be essentially doing something that does not fit the normal way this program would work, and it would need some kind of waiver. At page 233, the declarant there says that. And another document cited by your colleague, a letter in July 2001 by the CEO of TDX, expressly discusses that and asks for a waiver. But the statute itself, Your Honor, if I can step back one moment, the federal statutory provisions that govern this case themselves compel the conclusion that as a matter of law, the normal rule is that donated property that's donated through a state agency, through a donee in that state, can't be used outside of that state. There are a lot of reasons for that, but let me give you two obvious ones. Number one, the statute and the regulations specify that the state agency through which the donation is made is responsible from then on for overseeing and checking and supervising compliance with the program requirements. That's how this donation program works. So once a donation like this is made, let's say through the state of Alaska agency, it's absolutely undisputed that as a matter of law, the state of Alaska government is then responsible for supervising compliance with the donation. Now how the heck is it supposed to do that when the property is 4,000 miles away in Hawaii and Alaska can't send its enforcement agents to poke around the Hawaii shipyard to see how the dry dock is being used? Of course that can't be done, Your Honor. That's just a matter of common sense. Furthermore, the regulations also have an explicit provision for interstate cooperative agreements whereby the results sought to be achieved here can be achieved and not surprisingly what it requires is an agreement between the two state agencies, one in state A and one in state B. So here, for example, there's an express regulatory provision that says that the relevant agency in Hawaii and the relevant agency in Alaska could have been asked to get together and give their seal of approval with the federal government to some kind of deal like this. The record expressly shows the TDX here went to the state of Hawaii agency. So far your argument isn't quite joining your opponents. Your argument is basically that the law would not allow an arrangement where Ta-Nehisi acts as a kind of straw man in order to pass the dry dock through the government excess property program to a dry dock in Hawaii with some kind of arrangement so that Ta-Nehisi gets something out of it. Showing that under law that they couldn't do that is not the same thing as showing that they didn't do that. If the government actually signed off on such a deal, even though it wasn't supposed to, then I could see where there might be a genuine issue of fact. Your Honor, let me just put it bluntly. Any proposition that is asserted here that the GSA, that the federal government signed off on what happened here, borders on the observed. I mean, there just is no such thing. There's nothing even closely resembling it. And in fact, what they're saying is that basically this was all worked out and the government approved it. Well, but of course not. And where's the document saying so? And in fact, the document that my opposing counsel cited to you, the first one was this January 18, 2001 document. It is a letter by Morisco. Morisco's not even a party to this transaction. How could any letter from it? I think what they're saying about the Morisco letter is, hey, the Morisco letter was attached to the letter of intent. The letter of intent with the Morisco letter attached was attached to the conditional transfer agreement. So the government had the Morisco letter. The government knew the deal with Morisco and approved it. No, but look at the January 19 letter of intent, Your Honor, that is the legally relevant document. It expressly refers to Hawaii, quote, as the state where rehabilitation will take place and then talks about transporting it long distances. There is no plausible meaning to that document other than the scenario that there would be rehabilitation of this vessel to fix it up and clean it up for some temporary period in Hawaii. And then under the transfer document, TDX was required within 12 months. There was a one-year sort of grace period, if you will, 12 months to put it into use pursuant to the transfer document itself. So then what was contemplated is it would be transported at that point to Alaska, which we know from TDX's CEO's letter of July 2001 that Judge Wardlaw read from. That spells it all out, not out of our mouth, but out of the other side. And it's not just here, as I said a few moments ago, it's not just the idea of using this property in Hawaii instead of Alaska. That is one legally dispositive point in and of itself. But there's also the idea that when you are a donee and when you receive donated property from the federal government, it is for your use. You don't just then get to lease it or rent it or transfer it, whatever word you want to use, to someone else. You know, IBM or General Motors or a big private company that could never have been allowed to get the property and get them to just pay you a slice of the money. That's not how it works. Incidentally, was there any evidence one way or the other on whether the dry dock in Hawaii really was being used to teach Aleuts these various skills? At ER page 235, a couple of pages from where Your Honor read from before, the declarant from TDX says that there were, I'm forgetting whether the number is 6 or 7, 6 or 7 native Alaskans at the shipyard. So I can't say no to Your Honor's question, but it's almost no. A few people, a handful of people went down. I don't think there's any evidence. You need a few people, executives, to go down and negotiate the deal with Morisco, I would think. Right. That may well be true, but I believe there are a few. It's properly characterized, I think, as a handful of individuals who went down for part of the year temporarily and may have worked in Morisco's shipyard operation. I'm not actually aware of any evidence in the record that any of these people worked on the dry dock. They worked somewhere else on the shipyard operation, welding or painting, I think. That's my understanding. But in any event, you know, so what? The point is that the donee here has to use the property. It can't just turn around and rent, effectively rent or lease or transfer the property to a big for-profit company 4,000 miles away that obviously would never have been eligible to receive the donation in the first place, use itself as a pass-through, and just take a slice of every piece of business. That's not how the donation program works. Obviously, that's not how it works. And it can't be made better by saying, oh, and by the way, we'll send six people down there to learn welding skills. That's just as a matter of law. That is not how this program works. And here, that legal reality, the objective legal reality is, in fact, reflected in all of the transfer documents that were signed by both sides to effectuate this particular transfer. But apparently, there's no place to use this dry dock in Alaska. Well, I don't know whether that's true or not. And the most direct way I can answer Your Honor's question is if, golly, this was all a big mistake, well, just give the dry dock back. I couldn't figure out why they were talking about Ketchikan for the dry dock. Ketchikan has its own facilities, and it's, what, maybe 2,000, 3,000 miles from St. Paul. I would think Dutch Harbor would be the obvious place. Your Honor, I'm embarrassed to say my ignorance of Alaska is vast, and I don't know anything about the geography. So I don't even want to. I'm not from Alaska either. I really don't know. But, you know, if what is being said now, and I'm saying if, I'm not saying it. If what is being said now is, you know, in retrospect, this was all just one big giant. I used to commute to Ketchikan as a district judge, and it was 1,000 miles each way for me, and that's just from Fairbanks. Well, that's right. That's a lot closer than St. Paul. Again, Your Honor, if what's being said here is, in some real sense, what happened here is just a big misunderstanding, I mean, my answer to that is just give the dry dock back. We're not trying to throw anyone in jail or fine anyone. We just want the property back. In this case. Sorry, Your Honor? In this case. In this case. We just want the property back so that it can be put to use in a proper way and benefit someone who is supposed to be benefited. And, again, the underlying reality here is imagine if Morisco, this private shipyard in Hawaii, had showed up at GSA's headquarters and said, hey, we have this great idea. Give us the dry dock. I mean, everyone would have laughed. That wouldn't have been taken seriously. They don't qualify. But what is happening here, the fact on the ground, in reality, that's what happened. They got the dry dock, and they just paid for every ship lifted. They paid TDX a little bit of money. That is not how this program is supposed to work, and GSA never, ever approved it. And all of that is really undisputed. This case really does turn on legal principles. Unless the court has any further questions, I have nothing more. Thank you, counsel. Counsel, you have a couple of minutes for rebuttal. I have a question for you. The waiver provision in the letter in the conditional transfer agreement says without written approval. What you pointed to isn't written. It's a declaration saying that there was oral approval from somebody unnamed in Alaska. Have you got something else in here that shows written approval? Again, there are five writings involved. The distribution document is completely missing. The state provided one with its answer, and it turned out that distributed the property to BSE, and so they said it had been canceled. The written approval comes in the signing of the transfer document, which is signed by the state SASB on behalf of GSA. That incorporates the letter of intent, which incorporates the Morisco letter. So what you're referring to as the written approval is the document that says it has to be kept in Alaska unless there's written approval. Well, it would be simpler if it said it had to be kept in Alaska. It doesn't say that. And the fact that there's no discussion of transportation costs, which under the regs are borne by the SASB if property is to be moved, shows that neither the SASB nor TDX understood this as involving a transfer to Alaska. Mr. Browning from the SASB filed a declaration after we moved for summary judgment, and he did not dispute any of Mr. Kennedy's points concerning the understandings. It's very important to realize that the only reported case on donation of vessels, Pacific Osprey Corp. versus United States, involves out-of-state use of a PT boat in conjunction with third parties. And in that case, GSA approved it. Furthermore, the Steadfast, a dry dock which is the sister ship to our dry dock, is being used by the Port of San Francisco in conjunction with a private company. As the Court of Federal Claims. In San Francisco or where? In San Francisco, in the Port of San Francisco. The Federal Claims Court talked about the fact that government property is usually used by third parties. There is nothing improper with joint use. The question really is whether or not TDX has encumbered it or bailed it or entered into a lease. And if the Court had construed the documents that really apply to the use of the dry dock, in favor of the non-moving party, it would have found there's a triable issue of fact there. Now, Mr. Bondi's argument about the statute proves too much because the regulations plainly allow out-of-state use of property. The Property Act is written in terms of the location of the donee and the donor. It is not written in terms of the location of the property. He says that there's a letter from the Hawaii SAS saying TDX isn't eligible in Hawaii, but that's not the way that interstate distribution works. An eligible donee here can receive property in another state, and this is under Section 204 and 206 of the regs, 204C and 206D. Furthermore, there is an exhibit which was submitted by TDX at the summary judgment stage, a letter written confirming a discussion with the Hawaii SAS, saying that he had no objection to the dry dock operating in Hawaii. And the letter says, you further indicated your expectation that GSA will ask you to check on compliance work on the ex-competent. This is how compliance is accomplished, through cooperation between the states. I think there are genuine issues of material factor. Thank you, counsel. Tana Guseks v. Huber is submitted. We'll hear Stanley v. Carr. Good morning, Your Honors, and may it please the Court. My name is David Clark, and I represent the plaintiffs in the underlying action, Jose and Amelia Stanley.
judges: Hall, Kleinfeld, Wardlaw